FILED

2026 Mar-12 PM 01:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TIFFANY ATKINS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:23-CV-00094-MHH** |
| | } | |
| **DANIEL P. DRISCOLL, as** | } | |
| **SECRETARY OF THE ARMY,** [1] | } | |
| | } | |
| **Defendant.** | | |

## MEMORANDUM OPINION

Tiffany Atkins has sued her employer, the Secretary of the Army. Ms. Atkins works for the Army Corps of Engineers and alleges that the Corps violated Title VII of the Civil rights Act of 1964 by discriminating against her based on race and gender and by retaliating against her for participating in an EEOC investigation when the Corps declined her application to become a Supervisory Interdisciplinary IT Specialist. (Doc. 12). The Secretary has asked the Court to enter judgment in its favor on Ms. Atkins's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 26).

---

[1] On February 25, 2025, Daniel P. Driscoll became the Secretary of the Army. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Daniel Dirscoll should be substituted for Christine Wormuth as the defendant in this suit. *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds officer, the "court may order substitution at any time. . . .").

To evaluate the Secretary's motion for summary judgment, the Court begins with an overview of the procedural standard that governs motions for summary judgment. Then, consistent with that standard, the Court summarizes the summary judgment evidence and analyzes Ms. Atkins's Title VII discrimination and retaliation claims based on the summary judgment evidence.

\*\*\*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record in the light most favorable to the non-moving party. *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023).

"Contentions based on 'mere speculation and conjecture' cannot defeat summary judgment." *Terrell v. Sec'y, Dep't of Veterans Affs*., 98 F.4th 1343, 1351 (11th Cir. 2024), *cert. denied sub nom*. *Terrell v. McDonough*, 145 S. Ct. 273 (2024) (quoting *Cincinnati Ins. Co. v. Metro. Props., Inc*., 806 F.2d 1541, 1544 (11th Cir. 1986)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Terrell*, 98 F.4th at 1351 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986)) (alteration in *Terrell*).

\*\*\*

Ms. Atkins is an African American female. (Doc 25-2, p. 1). Ms. Atkins began working for the U.S. Army Corps of Engineers in Huntsville, Alabama as a GS-13 employee on June 2, 2013. (Doc. 25-1, p. 8, tp. 28:13–21). Initially, Ms. Atkins worked as a project manager. Later, she became an Information Technology Specialist. (Doc. 25-1, pp. 8–9, tpp. 28:22–29:23; Doc. 25-18, p. 1). Ms. Atkins had the same responsibilities in both roles. (Doc. 25-1, p. 9, tp. 29:18–23).

Charles Ford, the Director of Programs, the Corps' senior civilian authority, was Ms. Atkins's fourth-level supervisor. (Doc. 25-22, p. 1–2). Boyce Ross, the Corps' Director of Engineering, worked directly under Mr. Ford. Mr. Ross was classified as a Supervisory Civil Engineer and was Ms. Atkins's  third-level

supervisor. (Doc. 25-9, p. 1–2). Mr. Ford and Mr. Ross are Caucasian males. (Doc. 25-22, p. 2; Doc. 25-9, p. 2).

When Ms. Atkins began working for the Army, her IA group was a part of the Electronic Security Branch under the Electrical Mechanical Division. (Doc. 25-23, p. 2; *see* Doc. 25-1, p. 9, tp. 29:8–15; Doc. 25-7, pp. 3–4, 8, tpp. 8:3–9:4, 26:11–15). In July 2014, the group was reassigned to the Systems Cost Division under the Directorate of Engineering, led by Antonio Torres, a Hispanic male. (Doc. 25-20, p. 1–2). Following this reorganization, Mr. Torres became Ms. Atkins's second-level supervisor, (Doc. 25-20, p. 2), and Rick Owens became Ms. Atkins's immediate supervisor, (Doc. 25-9, p. 2).

In May 2014, a probationary employee in Ms. Atkins's IA Group, Larry Powers, was terminated because of complaints of unprofessional behavior, including confrontations with supervisors and a lack of responsiveness to counseling. (Doc. 25-20, p. 3; Doc. 25-7, p. 6, tp. 18:4–14). Mr. Powers filed an EEO complaint after his dismissal. (Doc. 25-7, p. 6, tp. 17:2–8). The complaint included allegations of discriminatory treatment of African American employees and named Ms. Atkins as a witness. (Doc. 20-2, p. 1). Ms. Atkins completed a "Principal Agency Witness Questionnaire" regarding Mr. Powers's complaint. In it, she expressed concerns that could be interpreted as personal allegations of disparate treatment. (Doc. 25-2, p. 1). Mr. Ross also served as a principal agency witness because of his oversight of

the Engineering Directorate, which included Mr. Powers.  (Doc. 25-7, p. 5, tp. 14:

17–22; Doc. 25-9, p. 3).

That fall, Mr. Ford approved the formation of a new IA and IT Branch in the

Systems Cost Division and the creation of a GS-14 Supervisory IT position to lead

it.  (Doc. 25-22, p. 3).  The position was posted on USAJOBS from October 3 to

October 9, 2014, with a salary range of $99,248 to $129,018 annually.  (Doc. 25-16,

p. 1).

Mr. Torres, as Chief of the Systems Cost Division, was the point of contact

for this vacancy.  (Doc. 25-12, p. 18, tpp. 65:16–66:3).  Mr. Torres collaborated with

the Civilian Personnel Advisory Center to manage the logistics of the recruitment

process, including the position posting and development of a recruitment plan.  (Doc.

25-12, pp. 18, 19, tpp. 65:16–66:3, 67, 72; Doc. 25-24, p. 1–2).  This plan outlined

the recruitment strategy, panel composition, position description, initial rating

criteria, and interview questions, and was finalized before posting the vacancy.

(Doc. 25-12, p. 25, tpp. 95:20–96:16; Doc. 25-13).  The position description required

at least one year of specialized work experience in Information Assurance and states:

> In order to qualify, you must meet the experience requirements
> described below. Your resume must clearly describe your relevant
> experience as part of your application.
>
> Experience required: To qualify based on your work experience, your
> resume must describe at least one year of experience which prepared
> you to do the work in this job. Specialized experience is defined as:
> Serving as an information assurance systems security specialist or

> systems security analyst performing duties such as coordinating security analysis and assessments, implementing security recommendations, performing security training, advising management officials on automation developments and services, and analyzing automated system vulnerabilities, risks, and threats, experience related to certification and accreditation in accordance with DoD Information Assurance and Accreditation Process (DIACAP). This definition of specialized experience is typical of work performed at the next lower grade/level position in the federal service (GS-13).

(Doc. 25-16, p. 3).

The job announcement was available to current and former federal employees, including those within the Department of Defense and other federal agencies, as well as individuals eligible for reinstatement. (Doc. 25-13, p. 2; Doc. 25-16, p. 2). Ms. Atkins applied for the position. (*See* Doc. 25-2, p. 1).

The position selection panel included Mr. Ford, Mr. Ross, Mr. Torres, and Gina Elliot. (Doc. 25-20. P. 4). Ms. Elliot was serving as the Chief of the Facilities Division within the Installations Support and Program Management Directorate and served as a member of the panel from outside the Engineering Directorate. (Doc. 25-20, p. 4; Doc. 25-23, pp. 1–2; Doc. 25-13, p. 2). Ms. Elliot is a Caucasian woman. (Doc. 20-23, p. 2).

Mr. Torres drafted initial rating criteria for the position to guide the panel's review of resumes. (Doc. 25-12, p. 20, tpp. 75:17–76:6). The rating criteria were leadership, management, technical, communications, and program management business process. (Doc. 25-13, pp. 10–15). Mr. Ford, Mr. Ross, and Mr. Torres

reviewed and scored 48 resumes using the rating criteria to determine which applicants were most qualified for interviews. (Doc. 25-12, p. 21, tpp. 77:9–78:23).

Using the rating criteria, Mr. Ford, Mr. Ross, and Mr. Torres selected ten candidates to interview, including Ms. Atkins, Daniel Shepard, William Mote, and Cedric Harris. (Doc. 25-12, p. 22, tpp. 82, 83; Doc. 25-14).

When she applied for the position, Ms. Atkins had served as a project manager for Information Assurance and as an Information Technology Specialist for INFOSEC at the GS-13 level for more than one year. (Doc. 25-18, p. 1). Ms. Atkins has a Bachelor of Science in Management Information Systems, a Master of Business Administration in Management Technology, and a Master of Science in Information Assurance & Security. (Doc. 25-18, p. 4). Before she worked for the Army Corp of Engineers, Ms. Atkins served as an Information Assurance Manager at the Redstone Arsenal from August 5, 2007, to June 1, 2013. (Doc. 25-18, pp. 2–3). Ms. Atkins's resume received a cumulative score of 50 points, making it the third highest scored among the applicant resumes. (Doc. 25-12, tpp. 83:9–84:17; Doc. 25-14).

When Mr. Shepard applied for the Supervisory IT position, he had just joined the Huntsville Center as an IT Specialist and worked in the same unit as Ms. Atkins. (Doc. 25-5, p. 4, tpp. 9:20–10:20). Mr. Shepard has a bachelor's degree in management. (Doc. 25-17, p. 11). Before working for the Army Corp of Engineers,

Mr. Shepard served in the military, (Doc. 25-17, p. 1), worked in various information assurance roles for approximately six years, (Doc. 25-17 pp. 2–9), and was an interim chief of the information assurance policy branch at Redstone Arsenal, (Doc. 25-17, pp. 2–3). Mr. Shepard's resume received a cumulative score of 50 points. (Doc. 25-14).

When Mr. Mote applied for the Supervisory IT position, he had supervisory and specialized cyber security experience. (Doc. 25-7, p. 12, tp. 44:1–4). Mr. Mote's resume received a cumulative score of 49 points, making it the 5th highest resume. (Doc. 25-14).

Ms. Elliot joined the panel after the resumes were scored and interviewees were selected. (Doc. 35-20, p. 4; Doc. 25-23, p. 3). While reviewing the position applications, Ms. Elliot emailed Mr. Torres and questioned whether Cedric Harris should receive an interview, given his resume score of 20. (Doc. 32-14, p. 1). Mr. Torres told Ms. Elliot that Mr. Ford had asked that Mr. Harris be included in the interview list and that "[w]hen you are dealing with the big boss at times you have to accommodate." (Doc. 32-14, p. 1).

The panel asked each of the interviewees the same ten questions. (Doc. 25-20, p. 5; Doc. 25-13, p. 16). The panel selected Mr. Shepard as the preferred candidate and designated Mr. Mote as the alternate. (Doc. 25-12, p. 23, tpp. 86:22–

87:15).  Mr. Ford approved the selections.  (Doc. 25-12, p. 23, tpp. 87:15–88:4).  The

panel did not rank the other interviewees.  (Doc. 25-12, pp. 23–24, tpp. 88:22–89:7).

The selection panel provided the following rationale for awarding the position

to Mr. Shepard:

> Mr. Shepard is currently a senior IT Specialist (INFOSEC) in the
> Information Assurance and Information Technology Branch. During
> his interview, he provided an extensive list of unique qualifications that
> aligns with the mission of the Branch, detailed significant past
> achievements that resulted in major organizational achievements,
> described a well thought out plan to apply his leadership skills to
> achieve organizational success, provided a solid plan to build and
> maintain a technically competent workforce, demonstrated significant
> awareness of future challenges in the cybersecurity arena and
> demonstrated current knowledge on how to champion diversity and
> maintain an environment free of sexual harassment in the workplace.
> Overall, he provided a strong vision of where the Branch needs to be
> lead [sic] and directed to provide the best support to the Army and
> Department of Defense customers and exhibited confidence in his
> ability to do so. In addition, Mr. Shepard is a Navy Veteran, Acquisition
> Workforce Certified Level III in Information Technology, Certified in
> Information Security, and a Member of the Army Acquisition Corps.
> The panel voted unanimously in ranking Mr. Shepard as the top
> candidate after the interviews. As his current supervisor participated in
> the selection panel, no additional effort in conducting reference checks
> were necessary.

(Doc. 25-15, p. 3).

The panel provided the following rationale for Mr. Mote's ranking as the

alternate selectee:

> Mr. Mote is currently the Huntsville Center Information Assurance and
> Security Office (IASO). He demonstrated very good knowledge of the
> required qualifications to effectively lead the organization as he
> previously worked in the branch and has a good understanding of the

requirements of the customer base. Mr. Mote has a diverse career in information security within the Department of the Army that includes time in the military service. He also demonstrated very good leadership skills, good people skills, as well as current knowledge on how to champion diversity and maintain an environment free of sexual harassment in the workplace. He demonstrated a solid understanding in the process of building and maintaining a competent technical workforce and has a good understanding of future challenges in cybersecurity. Mr. Mote is an Army Veteran and maintains certification in information security. The panel recommends him unanimously as the alternate candidate. As his past supervisor participated in the selection panel, no additional effort in conducting reference checks were necessary.

(Doc. 25-15, pp. 3–4).

Mr. Ford stated that Ms. Atkins's interview performance was comparatively weaker to the selected candidates and that she did not effectively convey a clear plan for leading the new branch or integrating it within the larger organization. (Doc. 25-22, p. 5). Mr. Torres likewise indicated that Ms. Atkins did not elaborate meaningfully on a question regarding supervisory responsibilities and gave a less compelling response concerning the promotion of diversity and a harassment-free workplace. (Doc. 25-20, p. 7). Mr. Ross noted that although Ms. Atkins possessed solid technical expertise, her background in supervision was limited, whereas the selected candidates showed greater strength in leadership and technical experience, (Doc. 25-9, p. 7), and Ms. Elliot explained that Ms. Atkins did not convince her that she was prepared for a leadership role or capable of advancing the branch in the future, (Doc. 25-23, p. 6).

Mr. Ross commented that Mr. Shepard's resume demonstrated that Mr. Shepard had the ability to communicate and that:

> [Mr. Shepard] had worked for an Army organization. He understood the Army command structure. He understood the DoD command structure and what was driving Information Assurance requirements from the Pentagon down to the Garrison level. He had the qualifications that we were looking for based on his experience out at Redstone.

(Doc. 25-7, p. 13, tp. 45:12–20). Mr. Torres stated that Mr. Shepard had considerable prior experience engaging with senior executive service personnel and general officers  and was the only candidate who effectively addressed the development of the branch during the interview. (Doc. 25-20, p. 7).

At the time of Ms. Atkins's interview, Mr. Ford was aware that Ms. Atkins had testified in favor "of a coworker's EEO complaint," but Mr. Ford asserts that he did not have specific knowledge of her role in the investigation. (Doc. 25-22, pp. 2–3). Mr. Ross knew that Mr. Powers had been removed but was not a decision-making official in the removal. (Doc. 25-9, pp. 2–3). Mr. Ross knew that Ms. Atkins "had been named as a witness" in the Powers EEO matter but had "no knowledge of the substance of her testimony or expected testimony." (Doc. 25-9, p. 3). Mr. Torres knew that Mr. Powers had been removed but was not involved in and did not know that Ms. Atkins was a witness in Mr. Powers's case. (Doc. 25-20, pp. 3, 8). Ms. Elliot was aware that Mr. Powers had been removed and that Ms. Atkins had provided testimony in his EEO matter, but Ms. Elliot did not know whether the

testimony was in support of or against Mr. Powers's claims. (Doc. 20-23, p. 3). Ms. Elliot noted that she had great respect for Ms. Atkins's ability and stated that no member of the panel made negative or derogatory comments about Ms. Atkins or mentioned an EEO complaint during the panel's discussion of Ms. Atkins's ability to perform the supervisory IT position. (Doc. 25-23, pp. 6, 7).

Ms. Atkins remained in her IT specialist position until July 2015, when she transitioned to a G-14 IT Specialist position at NASA. (Doc. 25-1, pp. 10–11, tpp. 36:4–37:22).

\*\*\*

### Race and Gender Discrimination

Because Ms. Atkins is a federal employee, the federal sector provision of Title VII controls her discrimination claims. *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1198 (11th Cir. 2021). Under the federal-sector provision of Title VII, "personnel actions affecting employees or applicants for employment ... in executive agencies ... shall be free from any discrimination based on race . . . [or] sex . . . ." 42. U.S.C. § 2000e-16(a). "[P]ersonnel actions must be made in 'a way that is not tainted by differential treatment based on' a protected characteristic." *Terrell*, 98 F.4th at 1352 (quoting *Babb*, 992 F.3d at 1199). "The Civil Service Reform Act of 1978, which governs federal employment, broadly defines a 'personnel action' to include most employment-related decisions, such as appointments, promotions,

work assignments, compensation, and performance reviews." *Babb v. Wilkie*, 589 U.S. 399, 405 (2021).

"Unlike private-sector discrimination claims, the federal-sector provision of Title VII does not "'require a plaintiff to prove that unlawful discrimination was a but-for cause of adverse employment action.'" *Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 996 (11th Cir. 2025) (quoting *Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 862 (11th Cir. 2025)). Thus, "a federal-sector employee must show only that a protected characteristic played *any* part in her employer's process in reaching an adverse employment decision." *Buckley v. Sec'y of Army*, 97 F.4th 784, 794 (11th Cir. 2024) (italics in *Buckley*). The employee may use direct evidence, circumstantial evidence, or both to make this showing. *Jimenez*, 146 F.4th at 996.

A federal employee may demonstrate causation by "present[ing] circumstantial evidence using McDonnell Douglas' first step—the prima facie case—to support his Title VII discrimination claim." *Jimenez*, 146 F.4th at 996 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).[2] To establish a prima facie case of discrimination for failure to promote, a plaintiff must show that:

---

[2] Because federal-sector Title VII claims require only a showing that a protected characteristic played "any part in [an] employer's process in reaching an adverse employment decision," a federal-sector Title VII plaintiff need not satisfy the heavier burden imposed under *McDonnell Douglas*. *Buckley*, 97 F.4th at 794–95. But a federal employee may choose "to use the *McDonnell Douglas* framework to state a claim." *Rosado*, 127 F.4th at 866.

"(1) she is a member of a protected class; (2) she is qualified for and applied for the position; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted." *Johnson v. England*, 350 Fed. Appx. 314, 317 (11th Cir. 2009) (citing *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1348 n. 2 (11th Cir. 2007)).[3] The fourth element typically requires "evidence of a comparator—someone who is similarly situated in all material respects." *Jimenez*, 146 F.4th at 996 (quoting *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022)). "[I]f the federal employee has other evidence to show that discrimination 'played any part' in the decision-making process, he need not present comparator evidence." *Jimenez*, 146 F.4th at 996 (quoting *Rosado*, 127 F.4th at 867).

A federal employee also may establish causation by "demonstrat[ing] a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination.'" *Jimenez*, 146 F.4th at 997 (quoting *Lewis v. Union City*, 918 F.3d 1213, 1221 n.6 (11th Cir. 2019)). A "convincing mosaic" requires evidence that "'strongly suggests[s]'" that an employer's decision was based on a

---

[3] Ms. Atkins asserts that she need only demonstrate that "(I) she belonged to a protected class; (ii) she was qualified for and applied for a position; (iii) despite her qualifications, she was rejected; and (iv) the position was filled with an individual outside her protected class." (Doc. 33, p. 13), but "[u]nder [the McDonnell Douglas] framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by proving, among other things, that [he] was treated differently from another similarly situated individual." *Rosado*, 127 F.4th at 866–67.

protected characteristic. *Jimenez*, 146 F.4th at 997 (quoting *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1337 (11th Cir. 2024)). For example, "[p]laintiffs may point to suspicious timing, ambiguous statements, systematically better treatment of similarly situated employees, or evidence that the employer's justification for its action is pretextual." *Jimenez*, 146 F.4th at 997.

"No matter which framework the employee pursues, [the Court] must answer the same 'ultimate question'—'whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination.'" *Jimenez*, 146 F.4th at 997 (quoting *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 941 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 154 (2024)).

The Eleventh Circuit's decision in *Rosado* illustrates these principals. In *Rosado*, an IT specialist for the US Navy alleged that he was denied promotions five times based on his race, national origin, and age and because of retaliation. *Rosado*, 127 F.4th at 862. One employment action Mr. Rosado challenged was the selection of another candidate for a GS-13 Director position. *Rosado*, 127 F.4th at 874. The Navy used a structured, multi-step selection process that included resume screening, panel review based on pre-established criteria, and interviews to fill the position. *Rosado*, 127 F.4th at 863, 874–75. The panelists scored the candidates based on management experience, technical experience, network experience, policy/planning experience, and certification/education and then interviewed the top scoring

candidates. *Rosado*, 127 F.4th at 863, 875. After the panel interviewed the candidates, the panel recommended someone other than Mr. Rosado for the director position. *Rosado*, 127 F.4th at 863, 875.

Mr. Rosado argued that he was more qualified than the selected applicant because he had more experience in Navy Facilities Engineering and had substantial supervisory experience. *Rosado*, 127 F.4th at 863, 875. The selection panel found that the successful applicant had more recent and relevant management, planning, and policy experience. *Rosado*, 127 F.4th at 863, 875. The successful applicant also outscored Mr. Rosado in the resume and interview portions of the selection process. *Rosado*, 127 F.4th at 863, 875. Because Mr. Rosado did not demonstrate that a similarly situated candidate outside his protected class was treated more favorably and did not provide other evidence that suggested discriminatory animus "played any part" in the hiring decision, the Eleventh Circuit affirmed summary judgment for the Navy on Mr. Rosado's discrimination claim. *Rosado*, 127 F.4th at 863, 875.

Here, Ms. Atkins has demonstrated that she experienced a personnel action because she was not hired for the supervisory position, that she was qualified for the job because she met the experience required by the job posting and had one of the highest ranked resumes, and that some outside of her protected class was selected, but Ms. Atkins has not demonstrated that the Army treated similarly situated

employees outside of her protected class more favorably because her qualifications differ from the qualifications of the successful applicant.

Ms. Atkins has degrees in information assurance and management information systems. (Doc. 25-18, p. 4). When she applied for the position, Ms. Atkins had held IT and IA roles for seven years and had worked for the Army Corp of Engineers for 15 months. (Doc. 25-18, pp. 1–3). Mr. Shepard has a degree in management and had served in the Navy as an electronics technician for five years. (Doc. 25-17, p. 11). When he applied for the position, Mr. Shepard had worked in IA roles for six years and had recently held a temporary supervisory position at Redstone Arsenal. (Doc. 25-17, pp. 1–10). Like the panelists in *Rosado* who selected an applicant with more relevant management and planning experience, the panelists here selected Mr. Shepard because he had more leadership experience and "understood the DoD command structure and what was driving Information Assurance requirements from the Pentagon down to the Garrison level." (Doc. 25-7, pp. 12, 13, tpp. 41:17–42:19, 45). Given the applicants' credentials, it cannot be said that "the disparities between the [Mr. Shepard's] and [Ms. Atkins's] qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *See Guerriero v. City of Delray Beach*, No. 23-10448, 2024 WL 2291686, at *3 (11th Cir. May 21, 2024) (quoting *Brooks v. Cnty. Comm'r of Jefferson Cnty.*,

446 F.3d 1160, 1163 (11th Cir. 2006)).[4]  Because Ms. Atkins has not demonstrated that an equally or less qualified applicant was selected for the promotion, she has not established a prima facie case under *McDonnell-Douglas*.

Nor has Ms. Atkins presented a "convincing mosaic" of evidence sufficient to establish discriminatory intent.  Ms. Atkins argues that the disparities in the scoring of resumes, selection of a candidate with a low-scoring resume for an interview, and Ms. Elliot's participation in the selection panel indicate that the applicant selection process was a "sham" to "achieve a pre-ordained result."  (*See* Doc. 33, pp. 2, 28–32).  Ms. Atkins argues that this evidence suggests that "the selection process was skewed to enable [Mr.] Shepard's discriminatory hire" and could allow a reasonable fact finder to conclude that a candidate was interviewed solely to "add a veneer of inclusion to [the Army's] discriminatory exercise."  (Doc. 33, pp. 29, 30).  Ms. Atkins's bare allegations of a "sham" process are not enough to create a disputed issue of fact concerning discriminatory intent.  *See Terrell*, 98 F.4th at 1351.

Ms. Atkins argues that an earlier hiring decision indicates that the Army's stated reason for selecting Mr. Shepard is pretextual because the Army hired Mr. Shepard for an IT specialist position over a female African American candidate with

---

[4] Ms. Atkins does not address Mr. Mote's qualifications in her response.  Accordingly, the Court need not consider whether Mr. Mote was less or equally qualified for the supervisory position.  *See* FED. R. CIV. P. 56(c)(3).

more leadership experience. (Doc. 33, pp. 16–19). In Ms. Atkins's view, because the female applicant had substantial leadership experience and was not selected to interview for the IT specialist position, the Army's decision to hire Mr. Shepard for the supervisory position due to his leadership experience is suspect. (Doc. 33, pp. 16–19). The argument butts up against the principle that employers may use different selection criteria to select applicants for different jobs. *See Jimenez*, 146 F.4th at 997 ("An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects.'" (quoting *Lewis*, 918 F.3d at 1228)); *Smith v. Sunbelt Rentals, Inc.*, 356 Fed. Appx. 272, 279 (11th Cir. 2009) (holding that an individual who holds a different rank and has different job responsibilities is not a proper comparator). The fact that the Army prioritized technical experience and expertise for one position and leadership experience for another does not suggest that discrimination motivated the Secretary's hiring decisions on the record in this case.

District courts do not "sit as a super-personnel department" and "second-guess the wisdom of an employer's business decisions." *Jimenez*, 146 F.4th at 996–97 (quoting *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)). Ms. Atkins has not put forth evidence from which a fact finder could infer that discrimination played a part in the Secretary's hiring decision. Accordingly, the

Court will enter summary judgment for the Secretary on Ms. Atkins's discrimination claim.

## Retaliation

Ms. Atkins also alleges that the Secretary retaliated against her.  To establish a prima facie case of retaliation, a plaintiff must demonstrate that she participated in protected activity and she experienced an adverse employment action, and she must establish a causal link between the protected activity and the adverse action.  *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006).  The Secretary argues that there is not sufficient evidence for Ms. Atkins to establish a causal link between her participation in Mr. Powers's EEOC case and the Army's hiring decision.  (Doc. 26, pp. 27–29).  Ms. Atkins has not responded to this argument.  Accordingly, Ms. Atkins has abandoned her retaliation claim.  *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (citations omitted) (concluding party's "failure to brief and argue [an] issue during the proceedings before the district court [wa]s grounds for finding that the issue has been abandoned.").  The Court therefore grants the Secretary's motion for summary judgment on Ms. Atkins's retaliation claim.

\*\*\*

For the reasons discussed above the Court grants the Secretary's motion for summary judgment on Ms. Atkins's Title VII discrimination and retaliation claims. The Clerk shall please **TERM** Doc. 26.  By separate order, the Court will enter a judgment for the Secretary and will close the file.

**DONE** and **ORDERED** this March 12, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE